**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Pamela E. Prescott, Esq. (SBN: 328243)
pamela@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Faisal Moledina

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**FAISAL MOLEDINA, Individually and On Behalf of All Others Similarly Situated,**

**Plaintiff,**

**v.**

**ZEVIA, LLC, and ZEVIA PBC,**

**Defendants.**

**Case No.:** 2:25-cv-05656-ODW-AGR

**<u>CLASS ACTION</u>**

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF:**

1) **CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA"), CAL. CIV. CODE §§ 1750, *ET SEQ.*;**
2) **CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**
3) **VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"), CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*;**
4) **BREACH OF EXPRESS WARRANTY;**
5) **UNJUST ENRICHMENT;**
6) **NEGLIGENT MISREPRESENTATION; AND,**
7) **INTENTIONAL MISREPRESENTATION.**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Plaintiff Faisal Moledina ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action complaint ("Complaint") for damages, injunctive relief, and any other available legal or equitable remedies resulting from the unlawful actions of Defendants Zevia, LLC and Zevia PBC, doing business as Zevia (collectively "Zevia" or "Defendant").

2. This Complaint concerns the illegal, unfair, and deceptive labeling, marketing, and sale of Zevia's beverage products, including: a) the representation that Zevia's products are made without preservatives; b) the designation and representation that the products are "plant-based" or use similar language implying they are entirely plant-derived and/or natural; and c) the representation that the products are of United States origin, without providing clear and adequate qualification regarding the foreign ingredients and components contained therein, as required by federal and state law, rules and regulations.

3. The unlawfully and deceptively represented products are sold through various channels, including, but not limited to, direct-to-consumer sales on the Defendant's website, third-party platforms such as Amazon.com ("Amazon"), and third-party merchants operating brick-and-mortar stores, as well as retail websites, including, but not limited to, Whole Foods, Sprouts, Target, and elsewhere.

4. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by his attorneys.

5. In the highly competitive beverage industry, some companies attempt to gain a competitive advantage by misleading consumers about their products. Defendant marketed its products as being made without preservatives. **However, these products contain citric acid**—an ingredient widely recognized within the beverage industry, by food science professionals, and by federal agencies as functioning as a

KAZEROUNI LAW GROUP, APC

preservative—rendering Defendant's marketing false, deceptive, misleading, and fraudulent.

6. Numerous federal and state laws, rules, and regulations govern the proper labeling of consumer products, including beverage products.

7. For example, the Federal Food, Drug, and Cosmetic Act ("FDCA"), and various state laws[1] that generally align with the FDCA govern the aspects of food and beverage labeling discussed herein. These laws reflect a fundamental principle: **consumers have the right to know what they are purchasing**.

8. When companies misrepresent that certain types of ingredients are omitted from a product, fail to disclose all components used in a product, mischaracterize the nature of their formulations, or falsely claim the origin of their products, they violate fundamental consumer protection laws. Such conduct undermines consumer trust, distorts the marketplace, and provides an unfair competitive advantage.

9. Under both the FDCA and California law, a food product is considered misbranded if its labeling is false or misleading in *any particular*.[2]

10. Additionally, Defendant's products are marketed and sold as "plant-based" (or similar "plant-derived" terminology), expressly warranting that they are plant-derived and, therefore, natural. However, these products contain non-plant derived ingredients (such as citric acid), rendering Defendant's claims misleading under both federal and California law.

11. Furthermore, Defendant's products are labeled as "Product of the USA" without any qualification, despite containing key ingredients and/or components, material to the products, that are not obtained domestically. This practice violates federal regulations that require clear and adequate qualification of the foreign ingredients and components used in a product when U.S. origin claims are made.

---

[1] *See* Cal. Health & Safety Code §§ 110660, 110740, 110760, 110765, 110770.

[2] *See* 21 USC § 343(a) and Cal. Health & Safety Code § 110660.

KAZEROUNI LAW GROUP, APC

12. Zevia's Zero Calorie Soda and Zero Calorie Energy Drink (collectively, the "Product(s)") purchased by Plaintiff were falsely represented as containing "No Preservatives", being "plant-based," and being a "Product of the USA," without clear and adequate qualification of the key foreign ingredients and components used therein. These representations are demonstrably false, as detailed further herein.

13. As stated by the California Supreme Court in *Kwikset v. Superior Court*, 51 Cal. 4th 310, 328-29 (2011):

> **Simply stated: labels matter.** The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities that may come to associate with a particular source. . .In particular . . . **the "Made in U.S.A." label matters**. A range of motivations may fuel this preference, from desire to support domestic jobs or labor conditions, to simply patriotism. The Legislature has recognized the materiality of this representation by specifically outlawing deceptive and fraudulent "Made in America" representations. (Cal. Bus & Prof. Code section 17533.7; see also Cal. Civ. Code § 1770, subd. (a)(4) (prohibiting deceptive representations of geographic origin)). The objective of section 17533.7 "is to protect consumers from being misled when they purchase products in the belief that they are advancing the interest of the United States and the industries and workers. . ." (emphasis added).

14. Defendant marketed, advertised, and sold its products with express representations that they contained no preservatives. This representation appeared uniformly across the marketing and advertising of all products manufactured, marketed, or sold by Defendant, including the specific Products purchased by Plaintiff—even though Zevia's products contain citric acid, an ingredient widely recognized within the beverage industry, by food science professionals, and by federal agencies as functioning as a preservative.



KAZEROUNI LAW GROUP, APC

15. Additionally, all of Defendant's Products are marketed with representations that they are exclusively "plant-based," "natural," or similar language, and that they are a "Product of the USA," without any qualification or disclosure. These claims appear either on the products themselves or in the accompanying marketing materials, including those related to the Products purchased by Plaintiff—despite the inclusion of foreign-sourced ingredients and non-plant-based citric acid that functions as a preservatives in the products.

16. Defendant's conduct of labeling, marketing and selling deceptively labeled products bearing the aforementioned misrepresentations violates: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (2) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*.; (3) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, *et seq*.; and constitutes (4) breach of express warranty; (5) unjust enrichment; (6) negligent misrepresentation; and (7) intentional misrepresentation.

17. Additionally, Defendant's conduct of labeling, marketing and selling deceptively labeled products bearing the representation that such products contain no preservatives and/or are "Product of the USA" without qualification also violates the FDCA, and 16 C.F.R. § 323 (Federal Trade Commission 2021) (the "MUSA Rule") and California laws.

18. This conduct caused Plaintiff, and other similarly situated consumers, damages, and requires restitution and injunctive relief to remedy and prevent future harm.

19. In addition to the false and misleading claims regarding the specific Products purchased by Plaintiff, Zevia's other products—including, but not limited to, those identified in **Exhibit A** and featured on Zevia's website (the "Class Products")—are likewise labeled and/or marketed with the same deceptive representations, including "no preservatives," "plant-based," "natural," and unqualified claims that they are a "Product of the USA."



KAZEROUNI LAW GROUP, APC

## JURISDICTION AND VENUE

20. This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because: (1) there is minimal diversity; (2) the amount in controversy in this matter exceeds $5,000,000, exclusive of interest and costs; and (3) there are more than one hundred (100) people in the putative class. Minimal diversity is met because the proposed Class (as defined below) includes all persons within California and the United States who purchased one or more of the Class Products. Thus, the Class includes at least one member who is a citizen of a state other than California (where Defendant and Plaintiff have citizenship) or Delaware (where Defendant also has citizenship). *See also,* Defendant's Notice of Removal, Dkt. No. 1, at ¶ 12.

21. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in the County of Los Angeles, State of California, which is within this judicial district; (ii) the conduct complained of herein occurred within this judicial district; and (iii) Defendant conducted business within this judicial district at all times relevant.

## PARTIES

22. Plaintiff is, and at all times mentioned herein was, a natural person, an individual citizen and resident of Los Angeles County, California.

23. Defendant Zevia, LLC is a limited liability company that is organized and exists under the laws of the State of Delaware, with its principal place of business within the State of California located at 15821 Ventura Boulevard, Suite 145, Encino, California 91436.[3]

24. Defendant Zevia PBC is a benefit corporation that is organized and exists under the laws of the State of Delaware, with its principal place of business within

[3] According to the California Secretary of State's website.

the State of California located at 15821 Ventura Boulevard, Suite 145, Encino, California 91436.[4]

25. Defendant is a formulator, manufacturer, distributor and seller of beverage products that conducts business: a) direct-to-consumer through its website and its Amazon store; b) through the websites of third-party vendors, including, but not limited to, Walmart.com, Target.com, CVS.com, Kroger.com and Samsclub.com; and c) distributes its products to be sold in brick and mortar stores including, but not limited to, Walmart, Whole Foods, Target, Sprouts, and elsewhere.

26. Plaintiff alleges that at all relevant times Defendant conducted business within Los Angeles County, California, and within this judicial district.

27. Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendant, respectively.

## NATURE OF THE CASE

28. Defendant was founded in 2007 and has grown into one of the leading "better for you" beverage companies in the United States.

29. Defendant markets and sells a portfolio of beverage products through multiple distribution channels including, but not limited to, its own website,[5] its Amazon store,[6] through third-party retailers online as well as in brick and mortar stores. Defendant currently generates annual revenues in the hundreds of millions of dollars.[7]

---

[4] According to the Delaware Secretary of State's website and/or Defendant's website.

[5] *See* https://www.zevia.com/collections/soda

[6] *See* https://shorturl.at/c2w08

[7] *See* https://www.google.com/finance/quote/ZVIA:NYSE (According to Google Finance, Defendant's annual revenues were approximately $110 million in 2020, $138 million in 2021, $163 million in 2022, $166 million in 2023, and $155 million in 2024).



KAZEROUNI LAW GROUP, APC

30. A key component of Defendant's "better for you" marketing of its beverage products is the elimination of sugar, calories, and artificial sweeteners—none of which could be achieved without the use of stevia, which is where Defendant's "Zevia" name is derived from. Additionally, one of Defendant's prominently stated and promoted ESG (environment social governance) goals is the elimination of plastic and the increase of product recyclability, for which the use of aluminum is critical.

31. As a result of its commercial success, Defendant filed for an initial public offering and became a publicly traded company on the New York Stock Exchange in 2021, gaining access to financial and professional resources that far exceed those available to most competing beverage companies.

32. Given Defendant's long-standing presence in the beverage industry, its substantial resources, and its operational sophistication, it is difficult to conceive how Defendant could so blatantly violate the well-established laws, rules, and regulations governing the labeling, marketing, and sale of beverage products.

33. At all relevant times, Defendant, and its agents, made and continue to make material misrepresentations regarding the Class Products.

34. Specifically, Defendant advertised, marketed, promoted, and sold the Class Products as containing "No Preservatives" when, in reality, they contained citric acid, an ingredient recognized within the beverage industry, by food science professionals, and other experts as functioning as a preservative, and which does in fact function as a preservative in the Class Products. Additionally, Defendant advertised, marketed, promoted, and sold the Class Products as "plant-based" and "Product of the USA" without disclosing the presence of non-plant-based citric acid and foreign ingredients, including Defendant's namesake ingredient stevia. These claims are false, unlawful, unfair, and deceptive, and they continue to be made to this day through Defendant or its agents.

35. Each consumer, including Plaintiff, was exposed to the same material



KAZEROUNI LAW GROUP, APC

misrepresentations, as substantially similar labels and/or marketing materials were used in connection with all Class Products sold throughout the United States, including within the State of California.

36. Federal and state laws, rules, and regulations regarding the accurate labeling of all ingredients in consumer products are well-established and clearly defined. Specifically, under the FDCA, a beverage is considered misbranded if its labeling is false or misleading in any particular.

37. Additionally, federal and state laws, rules, and regulations regarding the use of "Made in the United States" claims—including any synonymous claims, whether express or implied—are well-established and clearly defined with respect to products and services as discussed herein.

38. As a direct result of Defendant's unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased the Class Products based on false impressions and in reasonable reliance on Defendant's misrepresentations.

39. As a result, Plaintiff and other similarly situated consumers overpaid for the Class Products, purchased the Class Products over the products of competitors, and/or purchased the Class Products under the belief that the Defendant's representations were accurate, truthful and lawful. This includes initial and repeat purchases of the Class Products.

40. Despite clearly established and well-defined federal and state laws, rules, and regulations—including consumer protection laws—governing the labeling, marketing, and sale of beverage products in the United States, Defendant falsely, unfairly, and deceptively advertised, marketed, and sold the Class Products, including the Products purchased by Plaintiff, as further detailed herein.

41. Had Plaintiff and other similarly situated consumers been aware that the labeling and marketing of the Class Products contained false and deceptive misrepresentations, they would not have purchased the Class Products or would have paid less for them.

42. As a result of Defendant's false, unfair, and deceptive statements and/or their failure to disclose the true contents of the Class Products, along with the other conduct described herein, Plaintiff and similarly situated consumers purchased hundreds of thousands of units of the Class Products across the United States, including in California, suffering, and continuing to suffer, harm, including the loss of money and/or property.

43. Defendant's conduct regarding the labeling, marketing, and sale of the Class Products, as alleged herein, violates multiple federal and California laws, rules, and regulations, as detailed below.

44. This action seeks, among other things, equitable and injunctive relief; public injunctive relief; restitution of all amounts unlawfully retained by Defendant; and disgorgement of all ill-gotten profits resulting from Defendant's alleged wrongdoing.

45. Unless enjoined, Defendant's unfair, deceptive and unlawful conduct will continue into the future, and Plaintiff and Class members will continue to suffer harm.

## FACTUAL ALLEGATIONS

46. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

47. At all relevant times, including as of the filing of this Complaint, Defendant or its agents have made material misrepresentations regarding the Class Products.

### A. False "No Preservative" Claims

48. Defendant marketed, advertised and sold its products, including the Products purchased by Plaintiff, as being made without preservatives, when in fact that is false.

49. Consumers increasingly seek out products labeled as containing "no preservatives" because they associate such products with being healthier, safer, and more natural. The absence of preservatives is often viewed as an indicator that a



KAZEROUNI LAW GROUP, APC

product is minimally processed, free from synthetic or chemical additives that may be linked to adverse health effects, and inherently "fresher" because the product does not contain, or require, preservatives. As a result, the "no preservatives" representation carries significant weight in consumers' purchasing decisions and commands a premium in the marketplace.

50. In the beverage industry, "No Preservatives" claims are highly valued because they signal to discerning consumers that a product is healthier and more natural. These claims serve as a powerful marketing tool, often motivating consumers to pay a premium or to choose such products over competing options that do not make similar representations.

51. Consumers, including Plaintiff, have consistently sought out products marketed with "No Preservatives" claims due to both the actual and perceived health benefits associated with avoiding preservatives.

52. As a result, "No Preservatives" claims have become a critical and material factor in purchasing decisions, driving consumers to favor food and beverage products that prominently feature "No Preservatives" representations over those that do not.

53. Recognizing this consumer demand, Defendant deliberately sought to capitalize on it by prominently marketing, advertising and representing the Class Products with bold and conspicuous "No Preservatives" claims, in order to exploit consumers' awareness of and preference for this widely recognized and valued product attribute.

54. A reasonable consumer expects that when a product is expressly marketed as containing "No Preservatives," it is in fact free from any added preservatives, whether synthetic or naturally derived, consistent with the plain meaning of that representation.

55. While consumers value products marketed as containing "No Preservatives," the vast majority of the consuming public lack the specialized knowledge of



KAZEROUNI LAW GROUP, APC

beverage industry professionals, food scientists, or other formulation experts, and therefore would not know that citric acid functions as a preservative. Defendant, however, possesses precisely this specialized knowledge and was fully aware that citric acid functions as a preservative, and functions as such within the Class Products, yet nonetheless marketed the Class Products as containing "No Preservatives" to capitalize on consumers' expectations and promote sales.

56. It is precisely because ordinary consumers lack specialized formulation knowledge that federal regulations require disclosure when an ingredient functions as a preservative.

57. Under 21 C.F.R. § 101.22(j), a food containing a chemical preservative[8] must bear a label stating both the ingredient's common or usual name and a description of its function, such as "preservative," "to retard spoilage," "a mold inhibitor," "to help protect flavor," or "to promote color retention."

58. Defendant is well aware that truthful labeling identifying citric acid as a preservative would conflict with, and diminish, its carefully cultivated image as a "better-for-you" beverage company and prevent it from capitalizing on the "No Preservatives" market. Indeed, with the better-for-you soda market expanding over the past decade, there is a competitive drive amongst manufacturers to capture the market through their marketing and advertising materials that promise consumers health benefits. Manufactures like Defendant know that consumers place value on purchasing "healthier" beverages compared to traditional soda and that the inclusion of preservatives undermines this "better-for-you" image.

59. In the case of the Class Products, Defendant prominently features the "No Preservatives" claim in its marketing materials—a representation that continues to be repeated and disseminated by Defendant's agents, including its resellers, as of at least of the filing of this Complaint.

[8] *See infra* ¶ 65

KAZEROUNI LAW GROUP, APC

60. Below are non-exhaustive examples of the aforementioned representations that appeared in the marketing of the Class Products.[9]







[9] *See* https://a.co/d/eDGKxhT (last visited August 14, 2025).

KAZEROUNI LAW GROUP, APC







KAZEROUNI LAW GROUP, APC




61. Defendant's false and misleading "No Preservatives" representations were intentionally designed to mislead consumers into believing that the Class Products were fresher than they truly were and entirely free of preservatives. These claims exploited consumer trust in product marketing and materially influenced purchasing decisions. In truth, however, the Class Products contain an ingredient recognized by beverage industry professionals, food scientists, and other formulation experts as functioning as a preservative.

62. Despite Defendant's prominent "No Preservatives" claims, the Class Products—including the Products purchased by Plaintiff—contain citric acid, a well-known preservative and which in fact functions as a preservative in the Class Products.

63. Indeed, Citric acid is a widely recognized and well-documented preservative

KAZEROUNI LAW GROUP, APC

within the food and beverage industry. The U.S. Food and Drug Administration ("FDA") defines a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof," with specific exceptions such as salt, sugar, and vinegar. *See* 21 C.F.R. § 101.22(a)(5). Citric acid is not among the excluded substances and falls squarely within the FDA's definition of a chemical preservative.

64. Notably, the FDA's definition applies to "*any* chemical" (emphasis added) that tends to prevent or retard deterioration, making the formulator's subjective intent for using such a chemical irrelevant.

65. The FDA explicitly identifies citric acid as a preservative in its official guidance documents, including its *Food Ingredients and Colors* publication.[10] In this resource, the FDA lists citric acid as a preservative commonly used in food and other products to "Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness."

66. The preservative nature of citric acid has also been affirmed by the FDA through enforcement actions. For example, in a warning letter (attached here as **Exhibit C**) issued to the manufacturer of certain Chiquita brand fruit products,[11] the FDA concluded that the products were misbranded under 21 U.S.C. § 343(k) because they contained citric acid—a chemical preservative—without disclosing its function as such on the label, in violation of 21 C.F.R. § 101.22.

67. Citric acid functions as a preservative in beverages, including those manufactured and sold by Defendant. It serves multiple preservative roles: (a) it

---

[10] *See* https://www.fda.gov/files/food/published/Food-Ingredients-and-Colors-%28PDF%29.pdf (last visited May 21, 2025).

[11] *See* October 6, 2010 FDA Warning Letter to Chiquita Brands International, Inc. and Fresh Express, Inc. (https://web.archive.org/web/20211128074142/https://www.fdalabelcompliance.com/letters/ucm228663 or https://shorturl.at/Vdl8N) (last visited May 21, 2025).



KAZEROUNI LAW GROUP, APC

lowers the pH of the product, thereby creating an environment inhospitable to microbial growth; (b) it acts as an antioxidant, reducing oxidative spoilage; and (c) it sequesters metal ions that can catalyze spoilage reactions. These chemical effects occur regardless of any additional flavoring role citric acid may play.

68. Scientific literature confirms citric acid's preservative properties. For instance, researchers have established that even at low concentrations, citric acid inhibits the growth of bacteria and fungi by acidifying the environment and disrupting cellular metabolism. These preservative effects are integral to the shelf-stability of many beverage products.

69. Importantly, the function of an ingredient—not the manufacturer's subjective intent—is determinative of whether it qualifies as a preservative under federal labeling regulations. Thus, even if Defendant added citric acid for flavoring purposes, the fact that citric acid concurrently acts to retard spoilage and extend shelf life makes it a preservative under the law.

70. However, given Defendant's across-the-board use of citric acid in its products, it is not plausible that it was included solely for flavoring purposes. Indeed, citric acid appears in every product Defendant offers, regardless of the product's flavor profile demonstrating that it is included in the Class Products due to its function as a preservative.

71. Given the strong tart, tangy, and sour taste of citric acid, it strains credulity to suggest that every flavor of Defendant's products required its inclusion for "flavor purposes."

72. For example, it is implausible that flavors such as Cola (presumably designed to resemble Coca-Cola), Vanilla Cola, Creamy Root Beer, Cream Soda, Dr. Zevia (presumably designed to resemble Dr. Pepper), Watermelon Energy, or Peach Tea–all with distinct, non-sour flavor profiles–necessitated citric acid for flavoring. Yet, every one of these flavors, as well as all other flavors Defendant sells, contains citric

KAZEROUNI LAW GROUP, APC

acid.[12] This demonstrates that not only is the citric acid functioning as a preservative in the Class Products, but Defendant likely had knowledge of this fact yet affirmatively represented the Class Products as not containing preservatives.

73. The conclusion that citric acid is not included for "flavor purposes" is reinforced by the fact that neither Coca-Cola nor Dr. Pepper use citric acid in their formulations[13]—demonstrating that its inclusion in Defendant's products serves purposes other than flavoring.

74. Accordingly, Defendant's marketing and labeling of the Class Products as containing "No Preservatives," while knowingly including citric acid in the ingredient formulation, is false, deceptive, and misleading to reasonable consumers. The presence of citric acid in the Class Products directly contradicts the express "No Preservatives" claim and violates both consumer trust and applicable regulatory standards.

75. In addition to misleading consumers such as Plaintiff, Defendant's false "No Preservatives" claims also misled retailers, who in turn promoted the Class Products using the same deceptive representations—thereby amplifying and perpetuating the falsehoods. This chain of deception continues to this day.

76. Defendant also misled investors regarding the presence—or absence—of preservatives in its products. In at least one instance, Defendant filed a report with the U.S. Securities and Exchange Commission ("SEC") stating: "Each of our product lines has been carefully crafted for consumer enjoyment, ensuring that flavor is not sacrificed in the process of *eliminating* unhealthy sugar and artificial ingredients, *including* coloring, *preservatives*, and flavors" (emphasis added).[14]

---

[12] *See* **Exhibit A**

[13] *See* https://www.coca-cola.com/gb/en/brands

[14] *See* Zevia PBC, Annual Report (Form 10-K) at 16 (Dec. 31, 2021), available at https://www.sec.gov/edgar/browse/?CIK=0001854139.



KAZEROUNI LAW GROUP, APC

77. Furthermore, journalists, reviewers, and other media outlets were likewise misled by Defendant's false labeling, contributing to widespread public dissemination of the misleading "No Preservatives" narrative.[15] These widespread misrepresentations support Plaintiff's request for public injunctive relief.

78. As a result of Defendant's false "No Preservatives" claims, the Class Products secured an unfair competitive advantage across digital marketing channels, including social media platforms, search engine algorithms, and Amazon search rankings.

79. This deceptive positioning harmed both consumers and honest competitors operating in the same marketplace.

80. However, the full scope and impact of this deceptive marketing are uniquely within Defendant's possession and control, including records maintained by third-party marketing agents and platforms acting on its behalf. Accordingly, Plaintiff cannot ascertain the complete extent of Defendant's misrepresentations without the benefit of discovery.

81. To illustrate the continued impact of Defendant's deceptive marketing, on May 21, 2025, a general Amazon search for the term "No Preservatives" returned

---

[15] *See* https://www.consumerreviews.tv/zevia/ ("Zevia also ***avoids*** artificial flavors, colors, and ***preservatives***, ensuring a clean and enjoyable drinking experience." and "No Artificial Ingredients: ***Zevia is free from*** artificial flavors, colors, and ***preservatives***, providing a clean and pure soda option.") (emphasis added) (last visited May 21, 2025);

https://canvasbusinessmodel.com/products/zevia-marketing-mix (Website appears to share an internal marketing document from Zevia. "***No*** artificial ingredients or ***preservatives***." and "Zevia's commitment to health is further solidified through the ***absence of*** artificial ingredients or ***preservatives*** in its sodas.") (emphasis added) (last visited May 21, 2025);

https://foodsguy.com/best-zevia-flavors/ ("You ***won't find*** sugar, ***preservatives***, colors, or anything else. Just pure and natural flavor that you will love!") (emphasis added) (last visited May 21, 2025);

https://thehealthcarey.com/health/is-zevia-soda-bad-for-you/ ("The soda is also ***free from*** artificial colors and ***preservatives***, making it a healthier option for those who want to avoid these additives.") (emphasis added) (last visited May 21, 2025).



KAZEROUNI LAW GROUP, APC

Zevia products as the top two results.

82. This outcome demonstrates how Defendant's false "No Preservatives" claims continue to influence product visibility and consumer engagement across major digital marketplaces.

83. The prominence of Zevia's products in response to this search suggests that "No Preservatives" either appears in the metadata associated with these product listings or remains an actively targeted search term by Defendant or its agents.

84. A screenshot of this search result appears below:




85. Defendant possesses superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

86. Defendant's false and deceptive "No Preservatives" claims misled consumers into purchasing products that failed to meet their reasonable expectations. This

KAZEROUNI LAW GROUP, APC

deception resulted in financial harm, eroded trust in product marketing, and subjected consumers to potential physical risks associated with the undisclosed presence of preservatives. As a consequence, consumers—including Plaintiff—did not receive the preservative-free products they believed they were purchasing, nor the benefits associated with such representations. Instead, they were unknowingly exposed to preservatives without their informed consent and paid a premium for a product that failed to deliver as promised.

87. On information and belief, Defendant either charged a premium for the Class Products compared to its competitors or gained a significant competitive advantage by misleading consumers into choosing its products over others based on false "No Preservatives" claims. Federal and California laws are specifically designed to protect consumers from such false, deceptive, misleading, and unlawful representations, as well as from predatory business practices that unfairly manipulate consumer choice.

**B. False "Plant-Based" and "Natural" Claims**

88. Defendant manufactures, markets, advertises, and sells its products—including the Products purchased by Plaintiff—using claims that they are "plant-based" and similar language implying that the ingredients are exclusively plant-derived and natural and not artificial or industrially created.

89. Through these representations, Defendant expressly warrants to consumers that its products are composed solely of plant-derived ingredients. In truth, however, the Class Products contain industrially manufactured citric acid, rendering Defendant's "plant-based" claims false, deceptive, and misleading.

90. Consumers, such as Plaintiff, increasingly seek products marketed as "plant-based" and/or "natural" because they believe these products are safer, healthier, and free from synthetic, chemically derived, or otherwise non-natural ingredients, which may be harmful.

91. The growing demand for "natural" products is rooted in a desire for cleaner,



KAZEROUNI LAW GROUP, APC

more transparent options that align with a healthier lifestyle, including concerns about environmental sustainability and the reduction of exposure to potentially harmful chemicals.

92. As a result, claims such as "plant-based" and "natural" have become powerful drivers of consumer purchasing decisions, leading individuals to favor products they believe to be more environmentally sustainable, minimally processed, and beneficial to their health and overall well-being.

93. Aware of this consumer trend, Defendant deliberately sought to capitalize on it by promoting the Class Products not with vague or generic "natural" language, but through a range of specific and unequivocal claims including but not limited to statements such as:

- "We use *only* real, plant-based ingredients,"
- "*Zero* artificial ingredients,"
- "Zevia uses *only* real ingredients in our beverages; *no artificial* sweeteners, colors, or *ingredients*," and "...*only* 6 natural ingredients" (emphasis added).

94. These and similar representations are intended to assure consumers that the Class Products are entirely natural and free from synthetic and chemically made substances.

95. The term "plant-based" conveys to a reasonable consumer that ingredients—such as those used in the Class Products—are not chemically or synthetically produced, are derived from nature without the use of synthetic chemicals or processes, and are not so highly processed that any connection to natural ingredients is completely lost.

96. A reasonable consumer understands that when they purchase a product—especially a beverage product—that expressly or impliedly claims to be "plant-based" and/or "natural", in any way, they are reducing their exposure to synthetically created ingredients and contributing to the reduction of chemical use



KAZEROUNI LAW GROUP, APC

in the consumer goods industry, thereby helping the environment.

97. Defendant consistently markets the Class Products using "plant" and "natural" ingredients, despite the fact that the Class Products all contain industrially manufactured citric acid.

98. Despite the inclusion of manufactured citric acid in the Products and Class Products extensively markets the Class Products as exclusively "plant-based" or with similar representations.

99. Below are non-exhaustive examples of the aforementioned representation that Defendant used to promote the Class Products:[16]

> **Do Zevia's products contain erythritol?**
>
> Zevia products are solely sweetened by highly-purified stevia extract. Unlike some other products sweetened by stevia, Zevia does not contain any "bulking agents" such as erythritol, and is naturally sweetened. All Zevia beverages are zero sugar, zero calories and naturally sweetened. Zevia beverages contain a handful of simple, plant-based ingredients and are Non-GMO Project verified.

> **Corporate Overview**
>
> We are guided by our mission to create a world of better-for-you flavor -- better for people and for the planet. Zevia supports the path to improved global health by creating zero sugar, zero calorie, naturally sweetened beverages, making these premium clean-ingredient products accessible and affordable to all. We are a certified B Corp, pioneering beverage brand, offering a beverage platform across Soda, Energy Drinks, Organic Tea, Mixers and Kids drinks. Our products are made from a few simple plant-based ingredients, are Non GMO Project Verified and are never sold in a plastic bottle. Zevia is distributed across the U.S. and Canada through a diverse network of major retailers in the food, drug, mass, natural, warehouse club and ecommerce channels. As a great-tasting, sugar-free, clean ingredient beverage brand, Zevia is positioned to appeal to a broad range of consumer needs in our current markets and beyond.

---

[16] *See* https://www.zevia.com/about?scrollTo=faq (In response to "Do Zevia's products contain erythritol?") (last visited May 21, 2025)

https://investors.zevia.com/overview/default.aspx (last visited May 21, 2025)

https://s202.q4cdn.com/812343216/files/doc_financials/2023/q4/Zevia-Earnings-Call_Q4-2023-Final.pdf (last visited May 21, 2025);

https://a.co/d/38bOWCk (last visited May 21, 2025);

https://www.zevia.com/collections/soda/products/cola (last visited May 21, 2025);

https://www.target.com/p/zevia-organic-sugar-free-iced-tea-caffeine-free-hibiscus-tea-passionfruit-12-ounce-can-pack-of-12/-/A-1001657496#lnk=sametab (last visited May 21, 2025)

KAZEROUNI LAW GROUP, APC









KAZEROUNI LAW GROUP, APC







KAZEROUNI LAW GROUP, APC

100. Defendant's deceptive "plant-based" representations were deliberately crafted to mislead consumers into believing that the Class Products were entirely composed of natural, plant-derived ingredients. By exploiting consumers' trust in "plant" related marketing, Defendant unfairly influenced purchasing decisions, leading consumers to buy its products under false pretenses.

101. Despite Defendant's "plant-based" representations, the Class Products contain industrially manufactured citric acid and therefore cannot truthfully be described as exclusively "plant-based."

102. Contrary to Defendant's prominent "plant-based" and similar marketing claims, the Class Products—including those purchased by Plaintiff—do not consist exclusively of plant-based ingredients. Instead, they contain industrially manufactured citric acid ("MCA"), a non-agricultural, non-plant-derived compound present in every Class Product.

103. Citric acid ($C_6H_8O_7$) is a colorless organic acid that occurs naturally in citrus fruits and is widely used in the food and beverage industry.

104. Although citric acid can be naturally derived from citrus and other fruits, this method of production has been largely abandoned due to economic inefficiency, agricultural limitations, lack of standardization, and other practical constraints.[17] Instead, the citric acid used in virtually all commercial products today—including the Class Products—is industrially manufactured through fermentation with genetically modified mold (*Aspergillus niger*)—a process fundamentally distinct from natural extraction from citrus fruit and a significant departure from a

[17] *See* Lotfy WA, Ghanem KM, El-Helow ER. *Citric Acid Production by a Novel Aspergillus niger Isolate: II. Optimization of Process Parameters Through Statistical Experimental Designs*. 98 BIORESOURCE TECH. 3470 (2007). ("The supply of natural citric acid is limited and the demand can only be satisfied by biotechnological fermentation processes."); Max B, Salgado JM, Rodriguez N, *et. al*. *Biotechnological production of citric acid*. 4 BRAZ. J. MICROBIOL. 862 (2010). ("About 99% of world production of citric acid occurs via microbial processes, which can be carried out using surface or submerged cultures.")

reasonable consumer's expectation of what "plant-based" or "natural" means, as further described herein.

105. Citric acid produced through the above-described industrial synthesis is commonly referred to as MCA.

106. While citric acid naturally occurs in citrus fruits—particularly lemons, limes, and oranges, where it can constitute up to 8% of their dry weight[18]—MCA is a synthetic alternative used in products such as the Class Products.

107. The industrial synthesis of MCA involves introducing a sucrose- or glucose-containing medium to carefully selected and genetically mutated *Aspergillus niger* under highly controlled and optimized conditions.[19] In response to these conditions, *Aspergillus niger* metabolizes the sugars and synthesizes citric acid.

108. Notably, citric acid is not present in either the sugar medium or the *Aspergillus niger* itself prior to synthesis, and thus cannot be extracted from either, as can be done from natural sources such as citrus fruits.

109. Even after the mutated *Aspergillus niger* metabolizes the sugar medium—along with other introduced catalysts—to fuel its growth and produce a citric acid derivative as a byproduct, that derivative is not immediately usable.[20]

110. It must then undergo a series of chemically intensive processes. The compound is first reacted with non-natural sulfuric acid[21] and then subjected to

---

[18] *See* Penniston KL, Nakada SY, Holmes RP, Assimos DG. *Quantitative assessment of citric acid in lemon juice, lime juice, and commercially-available fruit juice products*. 22 J ENDOUROL. 567 (2008).

[19] *See* Max, *et al.*, *supra*. n. 17 ("Although many microorganisms can be employed to produce citric acid, *A. niger* is still the main industrial producer. In fact, <u>*specific strains that are able to overproduce citric acid*</u> in different types of fermentation processes <u>*have been developed*</u>.") (emphasis added)

[20] *See* Mores S, Porto de Souza Vandenberghe L, Magalhães AI, et. al. *Citric acid bioproduction and downstream processing: Status, opportunities, and challenges*. 320 BIORESOURCE TECHNOLOGY 124426 (2021)

[21] *See* https://pubchem.ncbi.nlm.nih.gov/compound/Sulfuric-Acid ("Pure sulfuric acid is not encountered naturally on Earth in its anhydrous form, due to its great affinity for water.") (last

additional refinement steps, including adsorption with resins and activated charcoal, evaporation, crystallization, and drying.[22] Only after these steps is the purified, biotechnologically synthesized citric acid (or MCA) produced. This method of production underscores the departure from any reasonable definition of "plant-based" or "natural," as it involves genetically modified organisms, non-natural catalysts and chemicals, and extensive chemical processing that defy consumer expectations.

111. Importantly, while Defendant may attempt to portray MCA as "plant-derived" based on the use of *Aspergillus niger*, this characterization fails because it is a well-established scientific fact that fungi, including *Aspergillus*, are not plants.[23] One of the primary methods Defendant used to advance its deceptive "plant-based" claims was through email campaigns, social media content, influencer collaborations, and other forms of digital marketing and partnerships—the full extent and reach of which remain solely within the knowledge and control of Defendant and its marketing agencies at this time.

112. One notable example is Defendant's use of country music artist Jelly Roll as a brand influencer. Defendant features a promotional video involving Jelly Roll on its official website, Amazon storefront, and other digital platforms. In the video, viewers are exposed to claims such as "Zero artificial ingredients," reinforcing Defendant's deceptive marketing narrative and contributing to the misleading impression that the Class Products are entirely natural and free of synthetic substances.

113. Defendant also misled investors at the time of its Initial Public Offering on the New York Stock Exchange by misrepresenting the true nature and origin of its

---

accessed August 11, 2025)

[22] *See supra* nn. 17 and 20.

[23] *See* https://asm.org/articles/2021/january/three-reasons-fungi-are-not-plants ("...we know that fungi are not plants…") (last accessed August 11, 2025)



KAZEROUNI LAW GROUP, APC

ingredients in the company's public disclosures.[24] This pattern of deception continues through statements made on Defendant's Investor Relations webpages.

114. Defendant possesses superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

115. Defendant's misleading "plant" related claims on the Class Products deceives consumers into purchasing items that do not meet their expectations of natural ingredients, causing financial harm and undermining their trust in product labeling.

116. On information and belief, Defendant either charged a premium for the Class Products compared to its competitors or gained a competitive advantage by having the Class Products chosen over others based on false "plant" related claims. California laws are designed to protect consumers from such false representations and predatory conduct.

**C. False U.S. Origin Claims**

117. Defendant produces, markets, advertises and sells the Class Products, including the Products purchased by Plaintiff, as "Product of the USA," (or some derivative thereof) without clear or adequate qualification.

118. The MUSA Rule clearly defines the meaning of "Made in the United States" or any synonymous representation[25] and outlines when such designations may be used without qualification. Specifically, clear and adequate qualifications must notify consumers if the good or service contains or is made with ingredients or

---

[24] *See* https://www.businesswire.com/news/home/20210722005540/en/Zevia-Announces-Pricing-of-Initial-Public-Offering ("... *All Zevia beverages are made with a handful of simple, plant-based ingredients*, contain no artificial sweeteners…") (emphasis added) (last visited May 21, 2025).

[25] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means **any unqualified representation,** express or implied, **that a product or service**, or a specified component thereof, **is of U.S. origin**, including, but not limited to, a representation that such product or service is "made," "manufactured," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added).

components that are not made or sourced in the United States.[26]

119. Despite the clearly established and well-defined federal and state laws, rules and regulations, including consumer protections laws, regarding U.S. origin claims, Defendant falsely, unfairly and deceptively advertised, marketed and sold its products, including the Products purchased by Plaintiff, as "Product of the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further discussed herein.

120. Despite their unqualified "Product of the USA" representations, the Class Products are made using ingredients and components that are neither domestically grown, sourced, nor produced.

121. For the Class Products, Defendant's unqualified claim appears on product labeling and packaging in contrasting text stating "Product of the USA," set apart from other wording, thereby reinforcing Defendant's intent to convey that the Class Products and their ingredients are of U.S. origin. The same claim also appears in the marketing and advertising of the Class Products, including on third-party reseller websites.

122. Below are non-exhaustive examples of the aforementioned representation regarding the Class Products:[27]

---

[26] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, **it is an unfair or deceptive act or practice** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), **to label any product as Made in the United States unless** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, ***and*** **all or virtually all ingredients or components of the product are made and sourced in the United States**. (emphasis added).

[27] *See* https://www.target.com/p/zevia-zero-calorie-soda-dr-zevia-12-fl-oz-can-pack-of-24/-/A-1001269551#lnk=sametab (last visited May 21, 2025)

https://www.cvs.com/shop/zevia-ginger-ale-12-oz-prodid-306139 (last visited May 21, 2025)

https://www.amazon.com/dp/B002FBH0AK?ref_=cm_sw_r_cp_ud_dp_2EYR1X4SPYXCC83KHE3E or https://shorturl.at/Eelg0 (last visited May 21, 2025)



KAZEROUNI LAW GROUP, APC

KAZEROUNI
LAW GROUP, APC









KAZEROUNI LAW GROUP, APC







KAZEROUNI LAW GROUP, APC




123. This representation is prominently displayed in the same location on the packaging of all Class Products or, in some cases, in another conspicuous location on the product packaging.

124. As a result of the "Product of the USA" representations on the Class Products packaging and in their advertising, online retailers have further propagated this misrepresentation through their websites' product pictures and descriptions, in addition to continuing to sell the Class Products with unqualified "Product of the USA" (or similar) misrepresentations on their shelves, where applicable.[28]

125. Defendant's unqualified "Product of the USA" representations were also prominently displayed in the "About this item" section of its Amazon product

[28] For illustrative examples of Defendant's "Product of the USA" (or similar) claims appearing on Target.com, CVS.com and Amazon sales pages, *see* ¶ 120, *supra*.

KAZEROUNI LAW GROUP, APC

pages.[29]

126. As a result of the unqualified U.S. origin claims on the Class Products' packaging, consumers have been misled for years, leading to both initial and repeat purchases of products they believed were made in the United States with ingredients and components sourced from the U.S.

127. Despite the prominent and unqualified claim that the Class Products were "Product of the USA," they are substantially made with foreign ingredients, a fact that is not properly disclosed on the label, as required by the MUSA Rule and California law.

128. For example, the Products purchased by Plaintiff each contain stevia leaf extract, as does every product sold by Defendant.

129. Stevia is the most essential and material ingredient in the Class Products, yet it is not sourced from the United States—a fact Defendant admitted in its Form 10-K Annual Report filed with the SEC for the year ending December 31, 2021.[30]

130. Stevia is so central to Defendant's products and branding that the name "Zevia" itself is a play on the word "stevia," underscoring the foundational role this foreign-sourced ingredient plays across Defendant's entire product line. One of Defendant's main marketing angles in support of its better-for-you soda marketing is that its products contain "zero sugar, "zero calories" and are only "naturally sweetened" with stevia.

131. Defendant has repeatedly emphasized, in every annual report filed with the SEC since becoming a public company in 2021, the central importance of stevia to the Class Products—both from Defendant's perspective and in the perception of its

---

[29] *Id.*

[30] *See* Zevia PBC, Annual Report (Form 10-K) at 17 (Dec. 31, 2021), available at https://www.sec.gov/edgar/browse/?CIK=0001854139 ("All of our stevia inventory is grown and processed overseas, particularly in China.")



KAZEROUNI LAW GROUP, APC

consumers—and the fact that its stevia is sourced from foreign suppliers.[31]

---

[31] *Id*. at 4, at 8 ("*Our products help consumers reduce their sugar intake* and avoid artificial ingredients by offering a refreshing and enjoyable *zero sugar*, *naturally sweetened alternative* to high-sugar and artificially sweetened competitors."; "Our *main ingredient*, after carbonated water, *is stevia sweetener*, which is extracted from the leaves of the stevia rebaudiana plant, the leaves of which contain many different naturally-occurring sweet compounds called steviol glycosides ("Sg")."");

*See also* Zevia PBC, Annual Report (Form 10-K) at 8, at 16 (Dec. 31, 2022) ("Our *main ingredient*, after carbonated water, *is stevia sweetener*, which is extracted from the leaves of the stevia rebaudiana plant, the leaves of which contain many different naturally-occurring sweet compounds called steviol glycosides ("Sg")."; "The *principal ingredients of our beverages*, aside from carbonated water, are *stevia sweetener*, flavors, and citric acid. *All Zevia products are solely sweetened with highly purified stevia leaf extract*."; "*Our stevia extract is sourced* through a multi-year supply agreement with a large multi-national ingredient company with *international agriculture operations* and substantial research and development capabilities."; "All of our stevia inventory is grown and processed overseas, particularly in China.");

*See also* Zevia PBC, Annual Report (Form 10-K) at 5, at 6, at 14 (Dec. 31, 2023) ("We are focused on *addressing the global health challenges resulting from excess sugar consumption* by offering a broad portfolio of *zero sugar, zero calorie, naturally sweetened beverages*."; "*We believe this consumer base favors better-for-you options* that support a balanced lifestyle and that they are driven less by discounts than some other demographic groups. *We believe Zevia consumers are heavily beverage engaged and migrate from other traditional full-calorie and low-calorie soda brands to choose Zevia* as an incremental beverage choice to aid in supporting their balanced lifestyle without sacrificing great taste. *We believe Zevia consumers care about their health, their diets, and their planet and are willing to pay a premium for beverage attributes that support those considerations*."; "*We have positioned our brand to capitalize on growing consumer interest in plant-based, clean label*, ethically produced and *great-tasting beverages*, *particularly those sweetened with stevia extract* or other plant-based sweeteners as an alternative to sugar or artificial sweeteners. Our products are solely sweetened by highly purified stevia extract and do not contain Erythritol.");

*See also* Zevia PBC, Annual Report (Form 10-K) at 6, at 8, at 17 (Dec. 31, 2024) ("*Our products help consumers reduce their sugar intake and avoid artificial sweeteners* by offering a refreshing and enjoyable *zero sugar, naturally sweetened alternative to high-sugar and artificially sweetened competitors*. We estimate that by choosing Zevia, our consumers have avoided over 79,000 metric tons of sugar in their diets since 2011."; "*Our main ingredient*, after carbonated water, *is stevia sweetener*, which is extracted from the leaves of the stevia rebaudiana plant, containing many different naturally occurring sweet compounds called steviol glycosides ("SG")"; "*The principal ingredients of our beverages*, aside from carbonated water, are *stevia sweetener*, flavors, and citric acid."; "A majority of the stevia extract used in our products is currently sourced from two suppliers, which we have selected because they meet our specific requirements for a particular blend of leaf compounds. General trade tensions between the U.S. and China, which began escalating in 2018, could have a negative impact on our business. The recent proposed tariff increases on imports from China have the potential to disrupt our supply chain and impose additional costs on our business if we cannot properly mitigate the impact of

KAZEROUNI LAW GROUP, APC

132. Additionally, the Products also contain caffeine, which Defendant acknowledges is derived from either coffee beans or tea leaves,[32] neither of which are commercially produced in the United States.[33]

133. Stevia is a high-intensity sweetener extracted from the leaves of the *Stevia rebaudiana* plant. It is used as a sugar substitute because it provides sweetness without adding calories. Stevia is significantly sweeter than sugar—estimated to be 200 to 300 times more potent—and is commonly used in beverages and food products marketed as "zero calorie." Without this ingredient, the Class Products could not achieve their sweetness profile without adding calories, making stevia essential to both the formulation and marketing of the products.

134. Defendant's entire brand identity and competitive positioning in the beverage market depend on the use of stevia as its exclusive sweetener.

135. Defendant promotes its products as "better-for-you," "zero sugar," "zero calorie," "naturally sweetened," and "plant-based"—claims that are only possible because stevia provides the necessary sweetness without adding sugar, calories, or artificial sweeteners.

136. In each of its Annual Reports, Defendant highlights the role of stevia in differentiating its beverages from conventional soft drinks and artificial diet sodas, identifying it as the "main ingredient" after carbonated water and a cornerstone of its plant-based, clean-label marketing strategy.

137. Defendant also acknowledges that its core consumers specifically seek out

---

these policies.")

[32] *See* https://www.zevia.com/about?scrollTo=faq (In response to: "Which Zevia beverages contain caffeine?" "The caffeine in all Zevia soda is extracted from the coffee bean. The caffeine in all Zevia Teas and Energy drinks is extracted from tea leaves.") (last visited March 21, 2025)

[33] *See* https://www.fao.org/faostat/en/#data/QCL/visualize (Select Item: Tea leaves. According to the Food and Agriculture Organization of the United Nations, tea is not produced in commercial quantities in the United States.); https://en.wikipedia.org/wiki/Coffee_bean (See "Bean Belt" under "Distribution."; "Brazil produces about 45% of the world's total coffee exports. The United States imports more coffee than any other nation.") (last visited March 21, 2025).

KAZEROUNI LAW GROUP, APC

its beverages for these very attributes, including the absence of added sugars and artificial sweeteners, and that they are willing to pay a premium for products meeting these criteria. Without stevia, Defendant could not formulate or lawfully market the Class Products as the zero-calorie, naturally sweetened beverages that form the basis of its brand promise, consumer appeal, and repeat purchasing behavior.

138. Numerous other products sold by Defendant similarly bear unqualified "Product of the USA" claims, despite containing stevia—a core ingredient present in every product manufactured and sold by Defendant. For example, Defendant's various beverage lines, including but not limited to sodas, energy drinks, kids' beverages, mixers, and teas, all contain stevia leaf extract and other ingredients or components that are not sourced from the United States.

139. Additionally, Defendant's tea beverage products contain tea in the caffeinated versions and hibiscus in the non-caffeinated versions—both of which are sourced from outside the United States. Nevertheless, Defendant prominently and without qualification represents these products as "Product of the USA" on their packaging and in marketing materials.

140. Stevia, tea, and caffeine are not the only foreign-sourced components used by Defendant in the production of the Class Products.

141. In its most recent Annual Report, Defendant also acknowledged that newly implemented and proposed import tariffs on steel and aluminum could materially affect its cost of goods sold, supply chain, and overall operating costs—underscoring the materiality of foreign aluminum to Defendant's total product costs and profitability.[34]

---

[34] *See* Zevia PBC, Annual Report (Form 10-K) at 11, at 16, at 18, at 36 (Dec. 31, 2024) ("We are actively monitoring trade policy and tariff announcements including the recent executive orders issued by the new U.S. federal administration in February 2025 regarding new tariffs on imports from Canada, Mexico and China. We are currently evaluating the potential impact of the announced tariffs as well as the recent implementation of a 25% import tax on all steel and aluminum entering the U.S. on our business and financial condition and actions we may take to



KAZEROUNI LAW GROUP, APC

142. Aluminum cans are not merely a packaging choice for Defendant—they are integral to the identity, marketing, mission and positioning of the Class Products. Defendant has repeatedly emphasized that it uses only aluminum cans for all of its beverages, touting the practice as a key sustainability initiative and a differentiator from competitors who use plastic bottles.[35]

143. Since its founding in 2007, Defendant has never sold a beverage in a plastic bottle, claiming that this packaging choice reduces plastic waste and supports its "better-for-the-planet" brand image. Defendant further highlights that this exclusive reliance on aluminum cans has saved tens of thousands of metric tons of plastic and prevented over one billion plastic bottles from entering the waste stream. The centrality of aluminum cans to Defendant's brand identity—and to the purchasing decisions of its environmentally conscious consumers—makes aluminum a critical component of the Class Products, and the cost and sourcing of that aluminum materially impact Defendant's business operations and financial performance.[36]

mitigate the impact. In addition, we are monitoring the potential impact, if any, of actions taken by these countries in response to the announced tariffs."; "Additionally, the recent implementation of a 25% import tax on all steel and aluminum entering the U.S. could adversely impact our operating costs and business overall."; "Additionally, the recent implementation of a 25% import tax on all steel and aluminum entering the U.S. could adversely impact our supply chain and raise operating costs for us."; "We have previously experienced challenges in sourcing aluminum for our cans, and could in the future experience similar disruptions in supply of our finished beverage products. The recent implementation by the new administration of a 25% import tax on all steel and aluminum entering the U.S. could adversely impact our supply chain and raise operating costs for us."; "Our cost of goods sold is subject to price fluctuations in the marketplace, particularly in the price of aluminum and other raw materials…")

[35] Zevia incorporates its "plastic free" commitment into its B Corp positioning and promotes the use of aluminum packaging—and corresponding absence of plastic—as a key selling point. *See* https://www.zevia.com/about?scrollTo=faq ("Drink Differently. Our mission is as clear as our Soda: Create a world of better-for-you flavor, *better for people and planet. … Without a plastic bottle in sight.*"; "Zero sugar. *Zero plastic too. To change soda for good, we're reducing the role of plastic. It's bad for us and everything else we share this planet with. So we've never used a plastic bottle. And never will.*"). (emphasis added) (last visited August 15, 2025)

[36] *See supra* n. 34. at 6 ("Sustainable packaging remains a key priority and we continue to seek to minimize our environmental impact. We take pride in reducing plastic waste by using only aluminum cans as beverage containers. Since our founding in 2007, we have never sold a

144. Defendant's practice of labeling the Class Products as "Product of the USA" despite the indisputable use of foreign-sourced stevia, tea, caffeine, and aluminum reflects a deliberate pattern of concealing the foreign origin of key ingredients and components.

145. This established practice makes it plausible—if not probable—that Defendant also sources additional ingredients from abroad and may even rely on foreign manufacturing in producing the Class Products—a conclusion further supported by statements in Defendant's Annual Reports.[37]

146. Notably, the climate, agricultural capacity, processing infrastructure, natural resources, and manufacturing conditions exist within the United States to enable Defendant to grow, process, and source stevia, tea, caffeine, and aluminum from domestic sources. Defendant could have engaged contract farmers and manufacturers to establish domestic supply chains for each of these ingredients and components–therefore, any contention that Defendant cannot produce or obtain the stevia, tea, caffeine, and aluminum from domestic sources is simply not true.

147. Additionally, every Class Product is packaged in an aluminum can and contains stevia, and in some instances caffeine and/or tea—all of which are sourced from outside the United States. The remaining ingredients and components of the Class Products consist of carbonated water, citric acid, natural flavors, and, in certain varieties, ginger extract and tartaric acid. As such, it is inconceivable that the combined value of the aluminum and stevia (and in some varieties tea or

---

beverage in a plastic bottle. Through only using aluminum cans, we estimate that we have saved over 30,000 metric tons of plastic and consumption of our products has resulted in the avoidance of over one billion plastic bottles since 2011.")

[37] *Id*. at 45 ("*Our contract manufacturers source some ingredients and packaging materials from international sources*, and as a result our results of operations could be impacted by changes in exchange rates."); *See also* Zevia PBC, Annual Report (Form 10-K) at 10 (Dec. 31, 2021) ("We have relationships with *four contract manufacturers who operate our manufacturing facilities across* the U.S. *and Canada*. We currently produce Zevia products at over 17 of their locations.") (emphasis added)

KAZEROUNI LAW GROUP, APC

caffeine) constitutes 5% or less of the final wholesale value of the manufactured product, given that the other ingredients are primarily water, preservatives, and natural flavors. This is particularly evident because water, preservatives, and natural flavors have negligible wholesale value absent the primary sweetening ingredient—stevia.

148. In addition, the preservative used in the Class Products—citric acid—is likely imported, further increasing the proportion of foreign inputs.[38] Accordingly, it is highly plausible that foreign-sourced components comprise well above 5% of the Class Products' final wholesale value.

149. Moreover, stevia is the namesake ingredient in the Class Products and is the "essence" of those products. Consumers thus place importance on the stevia ingredient when purchasing the Class Products and would expect it to be sourced domestically based on Defendant's unqualified U.S. origin claim.

150. By failing to disclose the use of foreign ingredients and components, Defendant has unfairly and deceptively misrepresented the Class Products as being of purely U.S. origin.

151. Had Plaintiff and other consumers similarly situated been made aware that the Class Products contained ingredients, including key ingredients, sourced from outside of the United States, they would not have purchased the Class Products.

152. Because information regarding Defendant's supply chain, ingredient origins, and costs remains solely within the possession, custody, and control of Defendant and its contract manufacturers, Plaintiff cannot at this stage fully detail the scope of Defendant's unqualified "Product of the USA" violations without the benefit of

[38] Publicly available trade and industry data from the World Bank confirm that, while the United States produces citric acid, it is also the world's largest importer of citric acid. China is the world's largest exporter. *See, e.g.*, World Bank, World Integrated Trade Solution (2023), https://wits.worldbank.org/trade/comtrade/en/country/ALL/year/2023/tradeflow/Exports/partner/WLD/product/291814;

https://wits.worldbank.org/trade/comtrade/en/country/ALL/year/2023/tradeflow/Imports/partner/WLD/product/291814.



KAZEROUNI LAW GROUP, APC

discovery. Nevertheless, the evidence already available—including the foregoing non-exhaustive examples—demonstrates Defendant's disregard for the laws discussed herein, and further discovery is likely to uncover additional foreign-sourced ingredients, components, and potentially manufacturing activities. Defendant possesses superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

153. Most consumers have limited awareness that products—along with their ingredients and components—labeled or marketed as made in the United States may, in fact, contain ingredients or components sourced, grown, or manufactured in foreign countries. This is a material factor in many purchasing decisions, as consumers believe they are buying superior goods while supporting American companies and jobs.

154. American consumers generally perceive products, ingredients, and components of U.S. origin as being of higher quality than their foreign counterparts.

155. On information and belief, Defendant either charged a premium for the Class Products compared to its competitors or gained a competitive advantage by having the Class Products chosen over others based on false, unqualified "Product of the USA" claims. Federal rules and California laws are designed to protect consumers from such false representations and predatory conduct.

## FACTS SPECIFIC TO PLAINTIFF FAISAL MOLEDINA

156. On or about March 2, 2023, Plaintiff searched online while at his home in Los Angeles County, California looking to purchase various beverage products.

157. While browsing beverage products available for purchase online, Plaintiff came across the Products on Amazon. On Amazon, Plaintiff reviewed information and marketing materials about Zevia's Zero Calorie Energy Drink and Zero Calorie Soda.

158. Marketing images of the Class Products displayed on Amazon, as shown in online product listings, prominently featured the claim "No Preservatives"—a



KAZEROUNI LAW GROUP, APC

representation that Plaintiff saw, read, and relied upon.

159. In addition to the "No Preservatives" claim, the Products were described as "plant-based" or other similar "plant" derived descriptions.

160. The Products were also marketed as being "Product of the USA" without any qualification, despite containing foreign ingredients in their formulations.

161. Relying on the aforementioned representations—just as any reasonable consumer would—and seeking to purchase a product that: (a) contained no preservatives; (b) was plant-based and natural; and (c) was made in the United States with domestic ingredients, particularly given the nature of beverage products, Plaintiff purchased a 12-pack of Zevia's Zero Calorie Energy Drink (Kola flavor) and a 20-pack of Zevia's Zero Calorie Soda (Dr. Zevia flavor) for approximately $62.98 (excluding tax and shipping) from Amazon, for his personal use.

162. Plaintiff's reliance on Defendant's representations was reasonable under the circumstances. Ordinary consumers are not experts in beverage formulation, nor are they expected to possess specialized knowledge regarding the nature or origin of product ingredients. Consumers reasonably trust that manufacturers will accurately represent their products—particularly when claims such as "No Preservatives," "Plant-Based," and "Product of the USA" are prominently displayed on product labeling or in marketing materials. There is no reason for consumers to doubt these representations or to suspect that a manufacturer would deliberately misstate the contents or characteristics of its products.

163. For instance, when a consumer sees an explicit representation of the absence of a type of ingredient in a product's marketing, such as "No Preservatives," they reasonably expect the product to contain no preservatives. A reasonable consumer would not expect the product to instead contain a preservative that is well-known to beverage manufactures like Zevia but otherwise unknown to the regular consuming public.

164. Similarly, when a consumer encounters a product labeled or marketed as

KAZEROUNI LAW GROUP, APC

"plant-based" or using similar language, they reasonably expect it to be composed of natural, plant-derived ingredients. Consumers do not anticipate that such a product would contain synthetic, chemically derived, or other non-natural compounds. Plaintiff's reliance on the Class Products' "plant-based" claims was reasonable, as consumers are not experts in ingredient origins or composition and have no reason to doubt such representations. Consumers also reasonably expect that a manufacturer would not misrepresent synthetic or non-natural ingredients as "plant-derived"—and thus "natural."

165. Furthermore, Plaintiff's reliance on Defendant's unqualified "Product of the USA" representation was reasonable, as consumers are accustomed to seeing disclosures like "Made in the USA with globally sourced ingredients" or similar qualified variations on product packaging and marketing—if and when such U.S. origin claims are made. When consumers encounter an unqualified "Product of the USA" or similar claim, they reasonably assume the product contains no foreign-sourced ingredients or components. This is even more true when products contain a key ingredient such as Zevia's namesake ingredient, stevia.

166. Defendant's representations regarding the Products and the Class Products were unlawful, unfair, deceptive, and misleading, as the Products: a) did contain a preservative; b) contained at least one synthetic, chemically derived, or otherwise not plant-derived ingredient; and c) was actually made with and/or contained ingredients or components sourced, grown, or manufactured outside the United States.

167. Accordingly, Defendant is not entitled to lawfully make the claims of "No Preservatives," "plant-based," and the unqualified "Product of the USA" claims that it made on and regarding the Products and the Class Products.

168. Defendant's representations were material to Plaintiff's decision to purchase the Products.

169. Indeed, in deciding to purchase the Products, Plaintiff relied on the labeling,

KAZEROUNI LAW GROUP, APC

marketing, and/or advertising prepared and approved by Defendant and its agents, as disseminated through the Class Products' packaging and marketing containing the misrepresentations alleged herein.

170. Had Plaintiff known that the Products contained preservatives, he would not have purchased the Products.

171. Furthermore, had Plaintiff known that the Products and the Class Products contained foreign, synthetic, chemically derived, or otherwise not plant-derived ingredients, he would not have purchased the Products.

172. In other words, Plaintiff would not have purchased the Products but for the "No Preservatives," "plant-based" and unqualified "Product of the USA" claims on the Products and the Class Products.

173. As a result, Plaintiff was harmed because Defendant took Plaintiff's money due to its unlawful, false, unfair, and deceptive misrepresentations on the Class Products, including the Products.

174. Each time Plaintiff and putative Class members purchased the Class Products, they relied on Defendant's representations in their purchasing decisions, as is typical of most U.S. consumers.

175. Consequently, Plaintiff and other similarly situated consumers were deceived by Defendant's unlawful actions.

176. Plaintiff believed, at the time of purchase, that the Products were of superior quality and that he was supporting U.S. jobs, the U.S. economy, the environment, and ethical working conditions by purchasing a product made with U.S.-sourced ingredients, rather than ingredients sourced, grown, or made outside the United States.

177. Ingredients and components grown or manufactured in the USA are subject to strict regulatory requirements, including, but not limited to, agricultural, environmental, labor, safety, ethical, and quality standards.

178. Foreign sourced, grown, or manufactured ingredients and components are not

KAZEROUNI LAW GROUP, APC

subject to the same U.S. standards and may pose greater risks to consumers, the environment, and the U.S. economy. This concern is especially significant for products intended for human consumption, such as beverage products.

179. Additionally, foreign-sourced, grown, or manufactured ingredients and components are generally of lower quality and less reliable than their U.S. origin counterparts.

180. False, unqualified, unfair and deceptive representations that products are "Product of the USA" reduce overall customer satisfaction compared to if such products were genuinely made in the U.S. using ingredients and components sourced, grown, or made domestically.

181. The Class Products, including the Products purchased by Plaintiff, contain foreign ingredients and are not worth the purchase price paid by Plaintiff and putative Class members.

182. The precise amount of damages will be proven at the time of trial.

183. Plaintiff and Class members suffered harm as a direct result of Defendant's false, unlawful, unfair, and deceptive representations, including but not limited to its misleading "No Preservatives" claims, "plant-based" claims, unqualified "Product of the USA" claims.

184. Defendant's false, unlawful, unfair, and deceptive advertising of the Class Products presents an ongoing threat to consumers, as this conduct continues to this day through Defendant's direct actions or omissions, and/or through the conduct of its agents.

## Class Allegations

185. Plaintiff brings this action on behalf of himself and all others similarly situated.

186. Plaintiff is a member of and seeks to represent a Nationwide No Preservatives Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

> All persons in the United States who, within four years prior to the filing of this Complaint, purchased one or more of the Class Products that were marketed or represented as containing "No Preservatives" or any derivative thereof—whether on the product packaging or in marketing materials—but that contained citric acid.

187. Plaintiff is a member of and seeks to represent a California No Preservatives Sub-Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in California who, within four years prior to the filing of this Complaint, purchased one or more of the Class Products that were marketed or represented as containing "No Preservatives" or any derivative thereof—whether on the product packaging or in marketing materials—but that contained citric acid.

188. Plaintiff is a member of and seeks to represent a Nationwide Plant-Based Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in the United States who purchased one or more of the Class Products, within four years prior to the filing of this Complaint, that were marketed or represented as "plant-based" and/or "Product of the USA" or any derivative thereof on the product or in its marketing materials, but which contained citric acid and/or ingredients or components not grown or manufactured in the USA.

189. Plaintiff is a member of and seeks to represent a California Plant-Based Sub-Class, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in California who purchased one or more of the Class Products, within four years prior to the filing of this Complaint, that were marketed or represented as "plant-based" and/or "Product of the USA" or any derivative thereof on the product or in its marketing materials, but which contained citric acid and/or ingredients or components not grown or manufactured in the USA.

190. The above mentioned Nationwide Classes and California Sub-Classes shall be referred to herein jointly as the "Class."

191. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Further excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

192. Plaintiff reserves the right to modify the proposed Class definition, including but not limited to expanding the Class to protect additional individuals and to assert additional sub-classes as warranted by additional investigation.

193. Numerosity: The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals within California.

194. Commonality: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, without limitation:

- The nature, scope, and operations of the wrongful practices of Defendant;
- Whether the Class Products contain citric acid;
- Whether the Class Products are or have been made with synthetic ingredients despite their "plant" derived claims;

- Whether the Class Products are or have been represented as being of U.S. origin without clear and adequate qualification;
- Whether Defendant negligently or intentionally misrepresented or omitted the fact that the Class Products, including the Product purchased by Plaintiff and other Class members, were sold illegally in California;
- Whether Defendant knew or should have known that its business practices were unfair and/or unlawful;
- Whether Defendant's conduct violated the CLRA;
- Whether Defendant's conduct violated the FAL;
- Whether Defendant's conduct was "unlawful" as that term is defined in the UCL;
- Whether Defendant's conduct was "unfair" as that term is defined in the UCL;
- Whether Defendant's conduct was "fraudulent" as that term is defined in the UCL;
- Whether Defendant's conduct was "unfair, deceptive, untrue or misleading" as those terms are defined in the UCL
- Whether Defendant was unjustly enriched by its unlawful, unfair and deceptive business practices;
- Whether Defendant breached express warranties to Plaintiff and members of the Class;
- Whether Defendant negligently or intentionally misrepresented its products;
- Whether Plaintiff and members of the Class suffered monetary damages as a result of Defendant's conduct and, if so, the appropriate amount of damages; and

- Whether Plaintiff and members of the Class are entitled to injunctive relief, including public injunctive relief.

195. Typicality: Plaintiff's claims are typical of those of the Class. Plaintiff and all members of the Class have been harmed by Defendant's wrongful practices. Plaintiff's claims arise from the same course of conduct that gave rise to the claims of the Class and are based on the same legal theories. Specifically, Plaintiff purchased one or more of the Class Products that were labeled, represented and/or advertised as: (1) containing "no preservatives"; (2) being "plant-based"; and/or (3) being "Product of the USA" or a similar representation, without clear and adequate qualification.

196. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of members of the Class. Plaintiff's counsel are competent and experienced in litigating consumer class actions. Plaintiff has retained counsel experienced in consumer protection law, including complex class action litigation involving unfair business practices. Plaintiff has no adverse or antagonistic interests to those of the Class and will fairly and adequately protect the interests of the Class. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and the proposed Class.

197. Predominance: Defendant has engaged in a common course of conduct toward Plaintiff and members of the Class, in that Plaintiff and members of the Class were induced to purchase the Class Products. The common issues arising from Defendant's conduct affecting members of the Class set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

198. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most members of the Class would likely find that the cost of

litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

199. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful, unfair and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to advertise, market, label, promote and package the Class Products in an unlawful, unfair, deceptive and misleading manner, and members of the Class will continue to be deceived, misled, harmed, and denied their rights under California law.

200. Defendant has acted on grounds that apply generally to the Class, so that Class certification is appropriate.

## NO ADEQUATE REMEDY AT LAW

201. Equitable relief is appropriate because Plaintiff and the Class lack an adequate remedy at law.

202. Any potential legal remedies available to Plaintiff and Class members are inadequate because they are not equally prompt, certain, or efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. A court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

203. Damages and restitution are also not the same amount. Unlike damages, restitution is not limited to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds



KAZEROUNI LAW GROUP, APC

taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because, for instance, claims under the UCL and FAL entail few elements.

204. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. To obtain a full refund of the purchase price of the Class Products under a damages claim, Plaintiff must show that the Class Products have no market value, whereas restitution does not require that showing.

205. The UCL's coverage is also more sweeping than the CLRA. For instance, the CLRA only protects consumers who purchase or lease goods or services for personal, family, or household purposes, while the UCL has no such limitation.

206. Additionally, legal remedies will only compensate Plaintiff and Class members for past harm and conduct that already occurred, but only a prospective injunction (equitable relief) prevents future harm. Monetary damages alone fail to make the Class Products properly labeled and advertised.

207. Additionally, public injunctive relief is available under the UCL claim, and damages do not adequately benefit the general public in a way that is equivalent to a public injunction.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violations of the Consumer Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code § 1750, *et seq.*)**

208. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

209. California Civil Code Section 1750, *et seq.,* entitled the Consumers Legal Remedies Act ("CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer."



KAZEROUNI LAW GROUP, APC

210. The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia,* that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protections.

211. Defendant's actions, representations, and conduct have violated, and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in the sale of skincare products to consumers.

212. Plaintiff and the Class members are not sophisticated experts with independent knowledge of product labeling, marketing practices and/or ingredient sourcing. Plaintiff and the Class members are California consumers who purchased the Class Products for personal, family or household purposes.

213. Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

214. The Class Products that Plaintiff and other Class members purchased from Defendant constitute "goods" as defined pursuant to Civil Code Section 1761(a).

215. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

216. Plaintiff's and the Class members' purchases of Defendant's products constituted a "transaction" as defined pursuant to Civil Code Section 1761(e).

217. Civil Code Section 1770(a)(2), (4), (5), (7) and (9) of the CLRA provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;

KAZEROUNI LAW GROUP, APC

> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods or services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised.

218. Defendant violated California Civil Code Section 1770(a)(2), (5), (7), and (9) by marketing and representing the Class Products as containing "No Preservatives." In truth, the Class Products contain citric acid—a well-established preservative—and were therefore falsely, deceptively, and unlawfully marketed in violation of the CLRA.

219. Additionally, Defendant violated Civil Code Section 1770(a)(2), (5), (7), and (9) by marketing and representing the Class Products as "plant-based" or using similar "plant" derived language, despite the inclusion of synthetically manufactured citric acid. Defendant further violated Civil Code Section 1770(a)(2), (4), (5), (7), and (9) by falsely marketing and representing the Class Products as "Product of the USA" without qualification, even though they contain ingredients and/or components that are sourced, grown, or manufactured outside the United States.

220. Plaintiff further alleges that the Defendant committed these acts with full awareness of the harm it would cause and engaged in such unfair and deceptive conduct despite this knowledge.

221. Defendant knew or should have known that its representations about the Class Products, as described herein, violated federal regulations and state laws, including consumer protection laws, and that these statements would be relied upon by Plaintiff and Class members.

KAZEROUNI LAW GROUP, APC

222. As a direct and proximate result of Defendant's violations of Cal. Civ. Code §§ 1750, *et seq*., Plaintiff and each Class member have suffered harm by paying for the Class Products, which they would not have purchased had they known the products were unlawfully, falsely, unfairly, and deceptively labeled and/or marketed.

223. Plaintiff and the Class suffered monetary harm as a result of Defendant's conduct because: (a) they would not have purchased the Class Products on the same terms had it not been for Defendant's unlawful, unfair, and deceptive actions as set forth herein; and/or (b) they paid a price premium for the Class Products or chose them over competing products due to Defendant's marketing misrepresentations and deceptive labeling, as discussed herein.

224. As a result of Defendant's false, unlawful, unfair, and deceptive misrepresentations regarding the Class Products, Plaintiff suffered economic harm, as his money was taken under false pretenses. Defendant's unlawful conduct included misrepresenting the contents of the Class Products, as well as the true nature and origin of the products and their ingredients.

225. Plaintiff and Class members reasonably relied upon Defendant's representations regarding the Class Products, and Plaintiff and the Class reasonably expected that the Class Products would not be unlawfully labeled or marketed in a unfair, deceptive and misleading manner.

226. Thus, Plaintiff and the Class reasonably relied to their detriment on Defendant's unlawful, unfair, deceptive and misleading representations.

227. Pursuant to California Civil Code § 1782(a), on or about May 22, 2024, Plaintiff sent Defendant Zevia, LLC a notice and demand for corrective action (the "CLRA Demand") via certified mail, informing Zevia of its violations of the CLRA and demanding that it cease and desist from such violations, as well as make full restitution by refunding all monies received in connection therewith. The CLRA Demand was sent to Zevia's President and CEO at the principal place of business

KAZEROUNI LAW GROUP, APC

for both Defendants as well as where the transaction occurred in compliance with California Civil Code § 1782(a).

228. Then, on or about August 22, 2025, Plaintiff sent Defendant Zevia, LLC and Defendant Zevia PBC a second notice and demand for corrective action (the "Second CLRA Demand") again informing Zevia of the violations of the CLRA and demanding that it cease and desist from such violations, as well as make full restitution by refunding all monies received in connection therewith.

229. As the alleged violations were not cured by Defendant Zevia, LLC or Defendant Zevia PBC within 30 days of either CLRA Demand, Plaintiff, on behalf of himself and the Class, seeks damages and attorneys' fees and costs pursuant to California Civil Code § 1782(d).

230. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

231. Under Cal. Civ. Code § 1780(a) and (b), Plaintiff and the putative Class are entitled to, and hereby seek, injunctive relief to prohibit such conduct in the future, as well as damages.

232. Attached hereto as **Exhibit B** is a sworn declaration from Plaintiff pursuant to Cal. Civ. Code § 1780(d).

## <u>SECOND CAUSE OF ACTION</u>

**Violations of California's Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

233. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

234. Plaintiff bring this claim individually and on behalf of the Class for Defendant's violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.



KAZEROUNI LAW GROUP, APC

235. Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201.

236. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

237. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising."

238. The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

239. Through the conduct alleged in detail above and herein, Defendant engaged in unlawful, unfair, deceptive and/or fraudulent business practices in violation of Bus. & Prof. Code § 17200, *et seq*.

### A. *"Unlawful" Prong*

240. Defendant has committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code § 17200 *et seq.*

241. Defendant violated federal and California law by falsely advertising, marketing, labeling, and selling the Class Products as containing "No Preservatives" when they did. Defendant also violated federal and California law by falsely advertising, marketing, labeling, and selling the Class Products as "plant-based" (or similar language) and "Product of the USA" without disclosing the inclusion of synthetic and foreign-sourced ingredients and components.

242. Specifically, by manufacturing, distributing, and/or marketing the Class Products with false, unlawful, unfair and deceptive claims, Defendant violates the FDCA, 21 U.S.C. § 343(a) and (k); Cal. Health & Safety Code §§ 110660, 110740,

KAZEROUNI LAW GROUP, APC

110760, 110765, 110770; California's CLRA, Civil Code § 1750, *et seq.*; and/or the federal Made in USA Labeling Rule, 16 C.F.R. Part 323.

243. Defendant falsely, unlawfully, unfairly, and deceptively represents that the Class Products contain "No Preservatives" when, in fact, they do. Defendant includes citric acid, a well-established preservative, in all the Class Products.

244. Furthermore, Defendant falsely, unfairly, and deceptively represents that the Class Products are exclusively "plant-based" (or similar language) when, in fact, they contain synthetic, chemically derived, or otherwise not plant-based citric acid.

245. Additionally, Defendant falsely, unfairly and deceptively represents that the Class Products are "Product of the USA" without clear and adequate qualification, despite containing ingredients and/or components that are sourced, grown, or manufactured in foreign countries.

246. Aside from the unlawful conduct described herein, Defendant has other reasonably available alternatives to advance its business interests, such as accurately, truthfully, and lawfully advertising, marketing, labeling, and selling the Class Products.

247. Instead, Defendant deliberately and deceptively misled consumers through unlawful and unfair practices for its own economic gain.

248. Plaintiff and Class members reserve the right to allege additional violations of law that constitute unlawful business practices or acts, as such conduct is ongoing and continues to this day.

**B. *"Unfair" Prong***

249. Defendant has engaged in acts of unfair competition prohibited by Bus. & Prof. Code § 17200, *et seq*.

250. Defendant engaged in a pattern of "unfair" business practices that violate both the letter and the intent of the statutes. Defendant's conduct threatens an incipient

KAZEROUNI LAW GROUP, APC

violation of the law or violates the policy and spirit of the law by manufacturing, distributing, and/or marketing its products with false, unfair and deceptive claims.

251. The utility of such conduct, if any, is vastly outweighed by the harm it inflicts, particularly through the manufacturing, distribution, and/or marketing of the Class Products by means of: (a) false representations that they contain “No Preservatives” when in fact they do; (b) misleading claims that they are “plant-based” (or similar language) despite containing synthetically manufactured citric acid; and/or (c) unqualified, unfair, and deceptive representations that they are "Product of the USA."

252. As a result of Defendant’s conduct: (1) the injury to consumers was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was one that consumers could not have reasonably avoided.

253. Without limitation, Defendant’s knowing mislabeling and false, unlawful marketing of the Class Products constitute unlawful, unfair, and deceptive business practices, misleading consumers into believing they are purchasing products that: (a) contain “No Preservatives”; (b) are “plant-based” despite containing synthetically manufactured citric acid; and/or (c) are "Product of the USA" using domestic ingredients and components.

254. Plaintiff could not have reasonably avoided the resulting injury.

255. Plaintiff reserves the right to allege additional conduct that constitutes further unfair business acts or practices.

### C. *“Fraudulent” Prong*

256. Defendant violated the “fraudulent” prong of the UCL by misleading Plaintiff and the Class to believe that the Class Products: (a) contain “No Preservatives”; (b) are “plant-based”; and/or (c) are "Product of the USA.”

KAZEROUNI LAW GROUP, APC

257. Specifically, the Class Products were falsely marketed as containing "No Preservatives" when, in fact, they contained citric acid—a well-established preservative. As a result of Defendant's false, deceptive, and misleading marketing, Plaintiff and Class Members were misled into unknowingly consuming a category of ingredients to which they did not and could not give informed consent.

258. Defendant also falsely represents the Class Products as "plant-based" or through similar language, when in fact the products contain citric acid that is synthetic, chemically derived, or otherwise not plant-based.

259. Additionally, the Class Products are falsely represented as "Product of the USA" without clear and adequate qualification, despite the fact that they contain foreign sourced, grown or manufactured ingredients and/or components.

260. Relying on Defendant's misrepresentations, Plaintiff purchased the Class Products.

261. Like Plaintiff, Class members purchased the Class Products in reliance on Defendant's misrepresentations.

262. Plaintiff and the Class are not sophisticated experts in beverage product marketing practices, product labeling, ingredient sourcing, or the regulations governing the Class Products.

263. Plaintiff and members of the putative Class acted reasonably in purchasing the Class Products based on their belief that Defendant's representations were accurate, truthful and lawful.

264. Plaintiff reserves the right to allege additional conduct that constitutes further fraudulent business acts or practices.

### D. *"Unfair, Deceptive, Untrue or Misleading Advertising" Prong*

265. Defendant's labeling, marketing, and advertising are unfair, deceptive, untrue, and misleading, as they mislead consumers into believing that the Class Products: (a) contain "No Preservatives," when they in fact do; (b) are "plant-



KAZEROUNI LAW GROUP, APC

based," despite containing citric acid that is not plant-derived; and/or (c) are "Product of the USA," despite being made with foreign-sourced ingredients and components.

266. Plaintiff, as a reasonable consumer, and the general public were likely to be, and in fact were, deceived and misled by Defendant's labeling and marketing. They reasonably interpreted Defendant's representations according to their plain and ordinary meaning—that the Class Products: (a) contain "No Preservatives"; (b) are "plant-based," meaning entirely plant-derived; and/or (c) are "Product of the USA," meaning made with domestic ingredients and components.

267. Plaintiff and the Class are not sophisticated experts in beverage product marketing practices, product labeling, ingredient sourcing, or the regulations governing the Class Products. They acted reasonably in purchasing the Class Products based on their belief that Defendant's representations were accurate, truthful and lawful.

268. Plaintiff and the Class lost money or property as a result of Defendant's UCL violations because, at a minimum: (a) they would not have purchased the Class Products on the same terms had they known the true facts about Defendant's representations; (b) they paid a price premium for the Class Products due to Defendant's alleged misrepresentations; and/or (c) the chose Class Products over the products of Defendant's competitors who made accurate, truthful and lawful representations about their products.

269. Defendant's alleged unlawful, unfair, and deceptive business practices, along with their unfair, deceptive, untrue, or misleading advertising, present a continuing threat to the public as Defendant and its agents continue to engage in unlawful conduct that harms consumers.

270. Such acts and omissions by Defendant are unlawful, unfair, and/or deceptive, constituting violations of Business & Professions Code §§ 17200, *et seq*. Plaintiff



KAZEROUNI LAW GROUP, APC

reserves the right to identify additional violations by Defendant as may be uncovered through discovery.

271. As a direct and proximate result of the acts and representations described above, Defendant has received and continues to receive unearned commercial benefits at the expense of its competitors and the public.

272. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct described herein, Defendant has been, and will continue to be, enriched by ill-gotten gains from customers, including Plaintiff, who unwittingly provided money based on Defendant's misrepresentations.

273. Plaintiff was harmed because Defendant took Plaintiff's money through unlawful, false, unfair, and deceptive representations made regarding the Class Products.

274. The conduct of Defendant, as described above, demonstrates the need for injunctive relief to restrain such acts of unfair competition pursuant to California Business and Professions Code. Unless enjoined by the court, Defendant will retain the ability to, and may, continue engaging in unfair and deceptive competition and misleading marketing. As a result, Plaintiff and the Class are entitled to both injunctive and monetary relief.

275. Plaintiff would like to purchase the Class Products again but cannot be certain he will not be misled in the future unless and until Defendant makes the appropriate changes to the labeling and marketing of its Class Products, as requested herein. Absent a court order compelling Defendant to change its business practices, Plaintiff is unable to discern whether Defendant has remedied the misrepresentations alleges herein resulting in a likelihood of injury in the future. For instance, Plaintiff would not know whether Defendant has begun to source the foreign ingredients domestically or not by solely looking at the label and ingredients absent proper qualification ordered by a court.

276. Pursuant to Bus. and Prof. Code § 17203, Plaintiff and the proposed Class are entitled to, and hereby seek, injunctive relief to prevent Defendant from continuing the conduct in question. Additionally, Plaintiff seeks public injunctive relief to prevent Defendant from marketing and selling products as: (a) containing "No Preservatives"; (b) being exclusively "plant-based" (or similar language); and (c) "Product of the USA" (or similar language) without clear and proper qualification.

277. In prosecuting this action to enforce important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees and costs pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law ("FAL")**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq*.)**

278. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

279. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, states that "[i]t is unlawful for any ... corporation ... with intent … to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement...which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

280. Defendant's material misrepresentations and omissions, as alleged herein, violate Bus. & Prof. Code § 17500, *et seq*. Defendant knew or should have known that these misrepresentations and omissions were false, unlawful, unfair, deceptive, and misleading. This includes, but is not limited to, the representations that: (a) the

Class Products contain "No Preservatives"; (b) the Class Products are plant-derived despite containing at least one ingredients which is not plant-derived; and (c) the Class Products are "Product of the USA" despite containing foreign-grown, sourced, or manufactured ingredients and components.

281. Plaintiff and the Class suffered tangible, concrete injuries as a result of Defendant's actions, as set forth herein, because they purchased the Class Products in reliance on Defendant's misrepresentations.

282. As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff and members of the Class are entitled to injunctive relief, equitable relief, and restitution.

283. Further, Plaintiff and the members of the Class seek an order requiring Defendant to disclose the misrepresentations and request an order awarding Plaintiff restitution for the money wrongfully acquired by Defendant through those misrepresentations.

284. Additionally, Plaintiff and the members of the Class seek an order requiring Defendant to pay attorneys' fees pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

## FOURTH CAUSE OF ACTION

**Breach of Express Warranty**

**[As to Defendant Zevia, LLC only]**

285. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

286. Defendant represented to Plaintiff and similarly situated consumers, through its labeling, advertising, and marketing, that: (a) the Class Products contain "No Preservatives" when, in fact, they do; (b) the Class Products are plant-derived despite containing at least one ingredient that is not plant-derived; and (c) the Class Products are "Product of the USA" without any qualification or disclosure of the inclusion of foreign ingredients and components.

KAZEROUNI LAW GROUP, APC

287. Defendant's representations regarding the true contents of the Class Products, the plant-derived nature of the Class Products, and the unqualified U.S. origin of the Class Products constitute affirmations of fact.

288. Defendant's explicit claims that the Class Products contain "No Preservatives," as well as Defendant's representations that the Class Products are "plant-based" and "Product of the USA," directly pertain to the nature and composition of the products. These representations form a fundamental part of the bargain between Defendant and purchasers, influencing consumer purchasing decisions and expectations.

289. Defendant's statements—prominently featured on the labeling and marketing of the Class Products—constitute express warranties regarding the nature, composition, and origin of the products and their ingredients.

290. Relying on these express warranties, Plaintiff and Class members purchased the Class Products, believing these warranties.

291. Defendant breached its express warranties by falsely representing that the Class Products contained "No Preservatives" when, in fact, they did. Additionally, Defendant breached its express warranties by representing that the Class Products were exclusively "plant-based" (or similar representation) and "Product of the USA" when, in reality, they contained foreign-sourced ingredients as well as at least one ingredient that was not plant-derived.

292. On or about May 22, 2024, Plaintiff sent Defendant Zevia, LLC pre-suit notice outlining the conduct complained of herein.

293. As a result of Defendant's breach, Plaintiff and Class members suffered harm and are entitled to recover either the full purchase price of the Class Products or the difference between their actual value and the value they would have held if Defendant's representations regarding the Class Products had been accurate, truthful, and lawful.

294. Plaintiff and Class members did not receive the benefit of their bargain and sustained additional injuries, as alleged herein.

295. Had Plaintiff and Class members known the true nature of the Class Products, they either would not have purchased the products or would not have paid the price Defendant charged.

296. Defendant's misrepresentations were a substantial factor in causing Plaintiff and the Class economic harm.

## <u>FIFTH CAUSE OF ACTION</u>
### Unjust Enrichment

297. Plaintiff pleads this unjust enrichment cause of action in the alternative to contract-based claims.

298. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

299. Under California law, the elements of unjust enrichment are the receipt of a benefit and the unjust retention of that benefit at the expense of another.

300. Plaintiff and members of the Class conferred non-gratuitous benefits upon Defendant by purchasing the Class Products, which Defendant misrepresented as to their ingredients, origin, and "natural" status.

301. Plaintiff and members of the Class allege that Defendant owes them money for the unjust conduct described herein that resulted in the wrongful acquisition of funds.

302. An undue advantage was taken of Plaintiff's and the Class's lack of knowledge of the deception, resulting in money being extracted to which Defendant had no legal right.

303. Defendant is therefore indebted to Plaintiff and members of the Class in a specific sum—the amount of money each paid for the Class Products, which Defendant should not retain in equity and good conscience.

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

304. Defendant is therefore liable to Plaintiff and members of the Class for the amount of unjust enrichment.

305. Defendant's retention of any benefit, whether directly or indirectly collected from Plaintiff and members of the Class, violates principles of justice, equity, and good conscience.

306. As a result, Defendant has been and continues to be unjustly enriched.

307. Plaintiff and the Class are entitled to recover from Defendant all amounts that Defendant has wrongfully and improperly obtained, and Defendant should be required to disgorge to Plaintiff and members of the Class the benefits it has unjustly received.

308. Defendant accepted and retained such benefits with knowledge that Plaintiff's and members of the Class's rights were being violated for financial gain. Defendant has been unjustly enriched by retaining the revenues and profits obtained from Plaintiff and members of the Class, and such retention under these circumstances is both unjust and inequitable.

309. As a direct and proximate result of Defendant's unlawful practices and the retention of monies paid by Plaintiff and members of the Class, Plaintiff and the Class have suffered concrete harm and injury.

310. Defendant's retention of the non-gratuitous benefits conferred upon it by Plaintiff and members of the Class would be unjust and inequitable.

311. Plaintiff and members of the Class are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendant, in a manner to be determined by this Court.

## SIXTH CAUSE OF ACTION
## Negligent Misrepresentation

312. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

313. Defendant represented to the public—including Plaintiff and the Class—through its marketing, advertising, labeling, and other promotional materials, that: (a) the Class Products contain "No Preservatives"; and (b) the Class Products are exclusively "plant-based" (or similar representations) and "Product of the USA," without any qualifying language. These representations are false and misleading because: (a) the Class Products contain citric acid, which functions as a preservative and is not plant-derived; and (b) the Class Products contain multiple ingredients and components that are sourced from outside the United States.

314. Plaintiff alleges that Defendant made these negligent, false and deceptive representations with the intent to induce the public, including Plaintiff and the putative Class members, to purchase the Class Products.

315. Plaintiff and other similarly situated individuals saw, believed, and relied upon Defendant's negligent, false, unfair, and deceptive misrepresentations, and purchased the Class Products as a result of this reliance.

316. At all relevant times, Defendant made the negligent, false, unfair, and deceptive misrepresentations alleged herein, knowing or reasonably having known that such representations were unlawful, unfair, deceptive, inaccurate, and misleading.

317. As a direct and proximate result of Defendant's negligent, false, unfair, and deceptive misrepresentations, Plaintiff and similarly situated consumers were induced to purchase the Class Products, purchase more of them, pay a higher price, or choose them over competitors' products.

318. Defendant's unlawful, unfair, and deceptive acts caused damages in an amount to be determined at trial for the Class Period.

//

//

//

//

KAZEROUNI LAW GROUP, APC

## SEVENTH CAUSE OF ACTION
### Intentional Misrepresentation

319. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

320. Defendant knowingly and intentionally represented to the public, including Plaintiff and the Class, through its marketing, advertising, labeling, and other means, that: (a) the Class Products contain "No Preservatives"; and (b) the Class Products are exclusively "plant-based" (or similar representation) and "Product of the USA" without any qualification. These representations are false and misleading because: (a) the Class Products contain citric acid, which functions as a preservative and is not plant-derived; and (b) the Class Products contain multiple ingredients and components that are sourced from outside the United States.

321. Defendant knew its representations were false because it maintains full control over the formulation and manufacturing of the Class Products.

322. Defendant acted intentionally by willfully and purposefully disseminating misrepresentations about the Class Products through labeling, online and offline marketing, advertising, and social media.

323. However, as described above, Defendant's representations regarding the Class Products are false, unlawful, unfair, deceptive and/or misleading.

324. Defendant knew that its representations regarding the Class Products were false, unlawful, unfair, deceptive, and/or misleading, yet continued to make such representations over a period of years.

325. Defendant further knew that retailers were marketing the Class Products in a false or misleading manner, as Defendant designed, manufactured, and affixed the product labeling to the Class Products before supplying them to retailers. Additionally, Defendant provided retailers with marketing materials that contained its false and misleading representations, thereby perpetuating the deception.

326. Plaintiff and the putative Class members saw, believed, and relied on Defendant's misrepresentations when deciding to purchase the Class Products.

327. As a direct and proximate result of Defendant's intentional misrepresentations, Plaintiff and the putative Class members suffered damages in an amount to be determined at trial.

328. By engaging in the acts described above, Plaintiff and the putative Class are entitled to recover exemplary or punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendant as follows, seeking equitable relief in the alternative to legal relief:

- Certification of this action as a class action;
- Appointment of Plaintiff as Class Representative;
- Appointment of Plaintiff's attorneys as Class Counsel;
- That Defendant's wrongful conduct alleged herein be adjudged and decreed to violate the consumer protection statutes asserted herein;
- An Order declaring that Defendant's conduct violated the CLRA, California Civil Code §§ 1750, *et seq.*, and awarding injunctive relief pursuant to Cal. Civ. Code § 1780(a) and (b);
- An Order declaring that Defendant's conduct violated California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*; and awarding injunctive relief pursuant to Bus. & Prof. Code § 17203;
- An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;
- An Order requiring the imposition of a constructive trust and/or disgorgement of Defendant's ill-gotten gains, compelling Defendant to pay restitution to Plaintiff and all members of the Class, and to restore to Plaintiff and Class members all funds acquired through any act or practice declared by this Court to be unlawful, fraudulent, unfair, or deceptive; in violation of laws, statutes,

KAZEROUNI LAW GROUP, APC

or regulations; or constituting unfair competition, along with pre- and post-judgment interest thereon;

- For pre and post-judgment interest on all amounts awarded;
- For an order of restitution and all other forms of equitable monetary relief, as pleaded, including awarding such relief pursuant to Bus. & Prof. Code § 17535; and/or Bus. & Prof. Code § 17203;
- Actual damages under California Civil Code § 1780(a);
- For public injunctive relief as pleaded or as the Court may deem proper;
- That Defendant be enjoined from continuing the wrongful conduct alleged herein and required to comply with all applicable laws;
- Punitive damages including under California Civil Code § 1780(a) and/or Cal. Civ. Code § 3294;
- General and compensatory damages in an amount to be determined at trial;
- That Plaintiff and each of the other members of the Class recover their costs of suit, including reasonable attorneys' fees and expenses pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5 and California Civil Code § 1780; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

329. Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: September 22, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: /s/ *Abbas Kazerounian*
Abbas Kazerounian, Esq.
*ATTORNEYS FOR PLAINTIFF*



KAZEROUNI LAW GROUP, APC